Andrew L. Packard (State Bar No. 168690)
Michael P. Lynes (State Bar No. 230462)
LAW OFFICES OF ANDREW L. PACKARD
319 Pleasant Street
Petaluma, California 94952
Telephone: (707) 763-7227
Facsimile: (707) 763-9227
Email: Andrew@packardlawoffices.com

Layne Friedrich (State Bar No. 195431)
Michael J. Chappell (State Bar No. 238138)
LAWYERS FOR CLEAN WATER, INC.
1004 A O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155
Email: Layne@lawyersforcleanwater.com

Counsel for Plaintiff
RUSSIAN RIVERKEEPER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSIAN RIVERKEEPER, a non-profit public benefit corporation organized under the laws of the State of California,<br><br>  Plaintiff,<br><br>  v.<br><br>PACIFIC STATES INDUSTRIES, INC., NORTH CLOVERDALE BLVD., LLC;<br><br>  Defendants. | Case No. 3:07-cv-05393-JCS<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*) |

RUSSIAN RIVERKEEPER (hereinafter "Riverkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.   This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"). This complaint seeks relief for unlawful discharges of polluted storm water and non-

storm water by Defendants Redwood Empire Sawmill, Pacific States Industries, Inc., and North Cloverdale Blvd., LLC (collectively "Defendants") from their industrial facility ("the Facility") into waters of the United States in violation of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act") and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "the General Industrial Storm Water Permit" or "Permit").  Defendants' violations of the discharge prohibitions, treatment technology requirements, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous. There is a real and present controversy between the parties.  Plaintiff seeks declaratory and injunctive relief, the assessment of substantial civil penalties, and an award of its reasonable fees and costs.  28 U.S.C. §§ 2201 and 2202 (declaratory judgment action).

    2.    This Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suits authorized by the Clean Water Act), and 28 U.S.C. § 1331 (actions arising under the laws of the United States).

    3.    Venue is appropriate in this District and Court pursuant to 28 U.S.C. § 1391(b) and pursuant to 33 U.S.C. § 1365(c)(1), because the events and omissions giving rise to these claims occurred within this judicial district.

    4.    On August 16, 2007, Plaintiff provided written notice to Defendants of their violations of the Clean Water Act and of Plaintiff's intention to file suit for such violations ("Notice Letter").  The Notice Letter alleges, inter alia, violations of the General Industrial Storm Water Permit.  Notice was also provided to the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), the Executive Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board"), and the U.S. Department of Justice as required by the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of the Notice Letter is attached hereto as

Exhibit A and is incorporated herein by reference.

5.    More than sixty days passed after service of the notice on Defendants.  Plaintiff is informed, believes, and thereon alleges that no state or federal Agency, including but not limited to, the EPA, the State Board or the Regional Board, has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action is not barred by any prior administrative penalty under Section 309(g) of the Act.  33 U.S.C. § 1319(g).

## II.    PARTIES

### A.    Russian Riverkeeper

6.    Riverkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Healdsburg, California.

7.    Riverkeeper's mission is to preserve, protect, and enhance the water quality, native fisheries, and wildlife of the Russian River and its tributaries. To further these goals, Riverkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8.    Riverkeeper has approximately 1,385 members who live and/or recreate in and around the Russian River watershed.  Members of Riverkeeper use and enjoy the Oat Valley Creek and the Russian River and its tributaries into which pollutants from Defendants' ongoing illegal activities are discharged.  Members of Riverkeeper use the Russian River and its tributaries to fish, sail, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study including monitoring activities.  The discharge of pollutants from the Facility impairs each of these uses.

9.    The interests of Riverkeeper's members have been, are being, and will continue to be adversely affected and irreparably harmed by Defendants' failure to comply with the requirements of the Clean Water Act, harms for which Riverkeeper members have no plain, speedy, and adequate remedy at law.  Riverkeeper members will continue to be harmed until Defendants bring their activities into compliance with the law.  The relief sought herein will

1  redress the harm to Riverkeeper's members caused by Defendants' activities.

2  **B.    Defendants**

3      10.    The Redwood Empire Sawmill is a division of Defendant Pacific States

4  Industries, Inc. ("Pacific States"), which operates the sawmill located at 31401 McCray Road

5  in Cloverdale, California (the "Facility").  The Facility's mailing address is listed as Post

6  Office Box 156, Cloverdale, CA 95425.

7      11.    Riverkeeper is informed and believes that Pacific States is doing business as

8  "Redwood Empire" and/or "Redwood Empire Sawmill."[1]  Information available to

9  Riverkeeper indicates that Roger A. Burch is the President and Registered Agent of Pacific

10  States and that Nolan Schweikl is the Facility's General Manager.  Pacific States maintains

11  offices at 2 West Santa Clara Street, 9th Floor, San Jose, California.  Information available to

12  Riverkeeper indicates that Pacific States holds title to APN 115-150-069 on which a portion of

13  the Facility is located.  Plaintiff is informed and believes, and therefore alleges that Pacific

14  States is an owner and/or operator of the Facility.

15      12.    Plaintiff is informed and believes that North Cloverdale Blvd., LLC, holds title to

16  APN 115-150-045 on which a portion of the Facility is located.  Information available to

17  Riverkeeper indicates that Richard A. Burch is also the Registered Agent for North Cloverdale

18  Blvd., LLC at 2 West Santa Clara St. 9th Floor, San Jose, CA 95113.  Plaintiff is informed and

19  believes, and therefore alleges that North Cloverdale Blvd. LLC is an owner and/or operator of

20  the Facility.

21      13.    This Complaint seeks relief from Defendants' violations of the Act at the

22  Facility.

23  **III.    STATEMENT OF FACTS**

24      **A.    Redwood Empire**

25

26  ---

27  [1] Plaintiff is informed and believes that Redwood Empire, Inc. was the owner and/or operator of the
Facility in the late 1980's.  However, information available to Plaintiff indicates that Redwood Empire,
28  Inc., merged into Pacific States in 1989.

CASE NO. 3:07-cv-05393-JCS

1    14.    On or about April 16, 1992 and again on or about May 7, 1997, Redwood Empire

2    submitted notices of intent to comply with the terms of the General Industrial Storm Water

3    Permit ("Notice of Intent to Comply" or "NOI").  The Facility was assigned the WDID number

4    1495006163.

5    15.    Information available to Plaintiff indicates that the Facility includes a sawmill,

6    planer, kiln, remanufacturing facility, fuel storage, and at least six acres of unpaved log deck.

7    This information also indicates that there is also an ammonia storage tank to store ammonia

8    used to treat sawdust for use as a soil amendment.  Defendants have reported to the Regional

9    Board that the Facility is classified under Standard Industrial Classification Codes 2411 ("Log

10   Storage and Handling"), 2421 ("General Sawmill/Planing Mill") and 2499 ("Wood products,

11   not classified elsewhere").

12   16.    Defendants conduct industrial activities that include the loading and unloading,

13   processing, storage, and transfer of lumber, wood products, and associated industrial materials.

14   Plaintiff is informed and believes that that the northern and southern portions of the Facility are

15   primarily used for lumber storage and processing and that the middle section of the property

16   contains several buildings, including at least ten structures that contain most of the milling,

17   chemical storage, and office space.  The 1997 NOI states that the property is 24 acres and 10%

18   paved or covered with impervious structures; however, Defendants' Storm Water Pollution

19   Prevention Plan (hereinafter "SWPPP", discussed in further detail below) dated January 2000

20   states that the property covers approximately 30 acres and is 70% paved or covered with

21   impervious structures.

22   17.    Plaintiff is informed and believes, and thereupon alleges that operations at the

23   Facility occur principally outside, without cover, and/or without the implementation of

24   sufficient Best Management Practices (hereinafter "BMPs") to prevent the contamination of

25   storm water at the Facility.  Additionally, Plaintiff is informed and believes, and thereupon

26   alleges, that Defendants have not adequately developed and implemented BMPs that would

27   prevent storm water from discharging from the Facility after it is exposed to and contaminated

28

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE                    5                    CASE NO. 3:07-cv-05393-JCS
RELIEF & CIVIL PENALTIES

1    by pollutants at the Facility.

2       18.    According to Defendants' SWPPP and self-monitoring reports, storm water

3    discharges from the Facility through two discharge points to the adjacent Oat Valley Creek.

4    Plaintiff is informed and believes, and thereupon alleges, that storm water is discharged from

5    other locations at the Facility, including but not limited to, through broken berms and other

6    inadequate BMPs that have resulted in the discharge of collected storm water and/or

7    unauthorized non-storm water, including but not limited to process wastewater.  Additionally,

8    Plaintiff is informed and believes, and thereupon alleges, that Defendants also discharge non-

9    storm water from the east-southeast side of the Facility near a large metal tank.  All of the

10   storm water and non-storm water discharges at the Facility go into Oat Valley Creek,

11   approximately 300 yards above Oat Valley Creek's confluence with the Russian River.

12      19.    Plaintiff is informed and believes that Oat Valley Creek is a water of the United

13   States and is tributary to the Russian River.  The Russian River is a water of the United States.

14      20.    Plaintiff is informed and believes, and thereupon alleges, that pollutants

15   discharged from the site include, but are not limited to: fugitive sawdust; wood debris;

16   sediment; metals; biological and industrial wastes; ammonia; nitrites and nitrates; oxygen-

17   demanding substances; and lubricants, fuels and other fluids and toxic chemicals associated

18   with the Facility's operations including but not limited to the maintenance of large trucks, lifts

19   and other heavy machinery and vehicles.

20      21.    According to Defendants' self-monitoring reports submitted to the Regional

21   Board, Defendants have measured discharges containing concentrations of suspended solids,

22   specific conductivity, Total Organic Carbon ("TOC"), Chemical Oxygen Demand ("COD"),

23   and zinc in excess of the EPA Benchmark Values on at least thirty-eight occasions since

24   August 16, 2002.  Self-monitoring reports filed pursuant to an NPDES permit that report

25   exceedances of permit limitations constitute "conclusive evidence" of violations of the permit

26   and the Act.  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988) *rev'd on other*

27   *grounds,* 485 U.S. 931, *amended by* 853 F.2d 667.

28

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE                    6                    CASE NO. 3:07-cv-05393-JCS
RELIEF & CIVIL PENALTIES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

22.     Plaintiff is informed and believes, and thereupon alleges, that Defendants' have operated the Facility in continuous violation of the Clean Water Act and the General Industrial Storm Water Permit since at least August 16, 2002 by, *inter alia*, discharging storm water and non-storm water containing pollutants including but not limited to, suspended solids, specific conductivity, organic carbons, oil and grease, COD, zinc, and other pollutants associated with Defendants' industrial operations into the waters of Oat Valley Creek, and the Russian River, without complying with the terms of the General Industrial Storm Water Permit.

23.     Defendants have taken samples of the storm water and non-storm water discharges at the Facility and had them analyzed by a laboratory on at least eight occasions (with samples collected from two discharge points during each rain event).  The sample results were reported in the Facility's Annual Reports submitted to the Regional Board for the Wet Seasons 2002-2003, 2003-2004, 2004-2005, and 2005-2006 Wet Seasons.

24.     According to Defendants' self-monitoring reports, since at least August 16, 2002, Defendants have known that storm water discharged from the Facility contains concentrations of total suspended solids and chemical oxygen demand in excess of the EPA benchmark values.  Since at least December 23, 2003, Defendants have known that storm water discharged from the Facility contains concentrations of TOC in excess of the EPA benchmark value of 110 mg/L.  Since at least February 28, 2005, Defendants have known that storm water discharged from the Facility contains concentrations of zinc in excess of the EPA benchmark value of 0.117 mg/L and the California Toxics Rule value of 0.12 mg/L.

25.     On at least ten documented occasions since August 16, 2002, the levels of total suspended solids detected by Defendants in the storm water discharged from its Facility exceeded the benchmark value of 100 mg/L for TSS established by the EPA.  Moreover, Defendants' visual observations recorded in their Annual Reports characterize the discharged storm water as "muddy" or "dark" and note that the source of the pollutant is likely "soil" or "dirt" from the Facility.

26.     On at least three documented occasions since August 16, 2002, the

concentrations of specific conductivity detected by Defendants in storm water discharged from the Facility exceeded the benchmark value of 200 μmho/cm for specific conductivity proposed by the State Water Board.

27.    On at least seven documented occasions since August 16, 2002, the concentrations of TOC detected by Defendants in storm water discharged from the Facility exceeded the benchmark value of 110 mg/L for TOC established by the EPA.

28.    On at least two occasions since August 16, 2002, the concentrations of zinc detected by Defendants in storm water discharged from the Facility met or exceeded the benchmark value of 0.117 mg/L established by the EPA.  On at least three occasions since August 16, 2002, the concentrations of zinc detected by Defendants in storm water discharged from the Facility exceeded the numeric limit of 0.1 mg/L established in the Basin Plan.  On at least two occasions since August 16, 2002, the concentrations of zinc detected by Defendants in storm water discharged from the Facility exceeded the numeric limit of 0.12 mg/L established in the California Toxics Rule.

29.    Plaintiff is further informed and believes, and thereupon alleges, that since at least August 16, 2002, Defendants have failed to implement and maintain an adequate Monitoring & Reporting Plan ("MRP") as required in their NPDES permit.  Despite having documented, on December 16, 2001, carbon oxygen demand ("COD") levels of 300 mg/L and 180 mg/L, both in excess of the EPA benchmark value of 120 mg/L, Defendants subsequently either failed to monitor for COD concentrations (a required parameter) or failed to report any such monitoring for COD to the Regional Board in any of their subsequent Annual Reports through the 2005-2006 Wet Season.  Similarly, on at least four occasions since August 16, 2002, Defendants have completely failed to analyze samples for concentrations of TOC or oil and grease, and zinc, in violation of Section B of the General Industrial Storm Water Permit.

30.    Defendants have failed to analyze their storm water samples for all pollutants that are "likely to be present in storm water discharges in significant quantities" including, but not limited to aluminum, arsenic, copper, lead, mercury, nitrate + nitrite, ammonia, and biological oxygen

1    demand and other pollutants associated with industrial activities at the Facility, as required

2    under Section B(5)(c)(ii) of the General Industrial Storm Water Permit.

3         31.    Defendants have also failed to comply with Section B(4) by failing to conduct

4    visual observations of every discharge point at the Facility at least once per month during each

5    wet season during the past five years and by failing to test stored water that is later released.

6    Each of Defendants' failures to comply with the Permit's Section B mandatory monitoring

7    requirements constitutes an ongoing violation of the Permit and the Act.  Defendants have been

8    in violation of the MRP requirements since at least August 16, 2002 and will continue to be in

9    violation of the Permit each day they fail to develop and/or implement an adequate MRP as

10   required by the Permit.

11        32.    Plaintiff is informed and believes, and thereupon alleges, that since at least

12   August 16, 2002, Defendants have failed to develop and implement an adequate SWPPP that

13   includes BMPs that satisfy the "best available technology economically achievable" for toxic

14   and non-conventional pollutants ("BAT") and "best conventional pollutant control technology

15   for conventional pollutants ("BCT") at the Facility.  Defendants have also failed to evaluate the

16   effectiveness of its BMPs and to revise its SWPPP as required by the Permit.  Defendants have

17   been in continuous violation of Section A(1) and Provision E(2) of the General Industrial

18   Storm Water Permit every day since at least August 16, 2002, and will continue to be in

19   violation every day that Defendants fail to develop and implement an effective SWPPP.

20        33.    Defendants have violated and will continue to violate Effluent Limitation B(3) of

21   the General Industrial Storm Water Permit by failing to develop and/or implement BMPs that

22   achieve compliance with the BAT and BCT requirement.  Every day since August 16, 2002

23   that Defendants have failed and continue to fail to develop and implement BMPs that achieve

24   BAT and BCT standards at the Facility is a separate and distinct ongoing violation of both the

25   Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

26        34.    Plaintiff is informed and believes that since at least every day since August 16,

27   2002 on which storm water is discharged from the Facility, which Plaintiff alleges occurs on

28

1  every rain event measuring 0.1 or more inches of precipitation, Defendants have discharged
2  and will continue to discharge storm water containing concentrations of pollutants including
3  but not limited to TSS, specific conductivity, TOC, COD, zinc in excess of Permit terms,
4  including but not limited to applicable water quality standards.  Defendants' violations will
5  continue each day contaminated storm water or unauthorized non-storm water is discharged in
6  violation of the requirements of the Permit.  Defendants are subject to civil penalties for
7  violations of the CWA occurring from August 16, 2002.

8      35.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have
9  never submitted true and correct Annual Comprehensive Site Compliance Evaluations to the
10  Regional Board as required by the Permit.  Section A(9) of the General Industrial Storm Water
11  Permit requires dischargers to conduct an Annual Comprehensive Site Compliance Evaluation,
12  which includes a complete review of all monitoring data and the SWPPP, an evaluation of
13  potential revisions to the SWPPP, and preparation of an evaluation report, which includes
14  reports of incidents of noncompliance and corrective actions taken, with each Annual Report
15  filed with the Regional Board.  Based on publicly available information, Plaintiff is informed
16  and believes, and thereupon alleges, that Defendants have failed to submit a complete Annual
17  Comprehensive Site Compliance Evaluation report, including reports of incidences of
18  noncompliance with the Permit, at any time since August 16, 2002.  Defendants have therefore
19  been in continuous violation of Sections C(11)(d) and A(9) of the General Industrial Storm
20  Water Permit every day since at least August 16, 2002.

21      36.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have
22  failed to file Annual Reports by July 1 of each year as required by the General Industrial Storm
23  Water Permit and have also signed and submitted inaccurate Annual Reports and purported to
24  comply with the General Industrial Storm Water Permit despite significant noncompliance at
25  the Facility.  For example, in each year that Defendants submitted a signed and certified
26  Annual Report to the Regional Board since at least August 16, 2002, Defendants attested that
27  they were in full compliance with the General Industrial Storm Water Permit despite the

28

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE          10          CASE NO. 3:07-cv-05393-JCS
RELIEF & CIVIL PENALTIES

1    ongoing noncompliance described above and despite the Regional Board's various notifications

2    of non-compliance during this period.  Defendants have violated Sections A(9)(d), B(14) and

3    C(9) & (10) of the General Industrial Storm Water Permit every time they failed to submit an

4    Annual Report and/or submitted an incomplete or incorrect Annual Report that falsely certified

5    compliance with the Act.  These violations are continuous and ongoing.

6           37.    Plaintiff is informed, believes, and alleges, that as a result of Defendants' failure

7    to comply with the Act and the Permit, pollutants have been, and continue to be, discharged

8    from the Facility to Oat Valley Creek and the Russian River.  Plaintiff is informed and

9    believes, and thereupon alleges, that these discharges adversely affect the beneficial uses and

10   ecological health of the waterways into which Defendants are discharging pollutants.

**B.    The Russian River**

12          38.    The Russian River watershed is approximately 100 miles long and from 12 to 32

13   miles wide, draining an area of some 1,485 square miles.  The headwaters of the Russian River

14   are about 16 miles north of Ukiah.  The river flows southward for 90 miles through Redwood,

15   Ukiah, Hopland, and Alexander Valleys, and through the northwestern part of the Santa Rosa

16   Plain, before entering the Pacific Ocean at Jenner.  The principal tributaries of the Russian

17   River are East Fork, Sulphur Creek, Mayacama Creek, Dry Creek and Mark West Creek.  Oat

18   Valley Creek, which runs along the north-eastern edge of the Facility, joins the Russian River

19   in Cloverdale.

20          39.    The Russian River is home to three species of salmonids: coho salmon, chinook

21   salmon and steelhead trout.  All three species have experienced severe population declines and

22   are listed as threatened under the Endangered Species Act, with coho also listed as

23   "endangered" under the California Endangered Species Act.  The Russian River is also home to

24   other species whose populations are threatened, endangered or declining to a level of concern,

25   including but not limited to, freshwater shrimp (Federally Endangered/State Endangered);

26   Western pond turtles (California Species of Concern); western tailed frogs (California Species

27   of Concern); California tiger salamanders (Federally Proposed for Listing/State Species of

28

Concern); and foothill yellow-legged frogs (California Species of Concern).  In addition, frogs, salamanders, snakes, muskrats, beavers, and river otters live in the watershed.  Various trees grow along the stream banks and attract large numbers of resident and migratory birds.  An entangling under story of shrubs, flowering plants, and vines provides sites for nesting, shelter and shade for many animals.  Algae and mosses proliferate in the water and on rocks.  Insects thrive here and in turn provide an abundant food source for invertebrates, fish, and birds. *California Coastal Commission's California Coastal Resource Guide*, at http://ceres.ca.gov/ceres/calweb/coastal/streams.html ("CCC Online Coastal Resource Guide: Streams").

40.    Riverkeeper is informed and believes that salmonids also spawn or attempt to spawn in Oat Valley Creek, directly adjacent to the Facility; other threatened or endangered species and other wildlife also make use of Oat Valley Creek in areas downstream from the Facility.

41.    The North Coast Regional Board's Water Quality Control Plan ("Basin Plan") designates numerous beneficial uses for the Russian River.[2]  Beneficial uses are intended to represent the purposes of the water body that are specifically protected by the Clean Water Act. When those uses are not attained, the Regional Board designates the water body as impaired under Section 303(d) of the Clean Water Act.  The North Coast's 303(d) list indicates that the Russian River is impaired for sediment/siltation and temperature on the entire river, and impaired by low dissolved oxygen, nitrogen, phosphorous, and pathogens on some reaches of the river.  Therefore, the receiving waters for pollution from the Facility are impaired, and the Defendants' illegal discharge of pollution contributes to the continued impairment of the

---

[2] According to the Basin Plan, the Russian River's beneficial uses include: municipal; agriculture, industrial, groundwater (in some reaches of the river); freshwater; navigation; hydroelectric power (potential); water contact recreation, non-water contact recreation, commercial and sport fishing; warm freshwater habitat; cold freshwater habitat; spawning, reproduction, and/or early development; wildlife habitat; rare and endangered species; migration of aquatic organisms; and estuarine habitat (in some reaches of the river).  *Water Quality Control Plan, North Coast Region*, Regional Water Quality Control Board, North Coast Region, Table 2-1 (2006).

1   Russian River's beneficial uses.

2   **IV.    STATUTORY AND REGULATORY BACKGROUND**

3       **A.    The Clean Water Act**

4       42.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of a

5   pollutant into waters of the United States unless the discharge is in compliance with various

6   sections of the Act.  The Act requires any person who discharges or proposes to discharge

7   pollutants into waters of the United States to submit a National Pollution Discharge

8   Elimination System ("NPDES") permit application.  33 U.S.C. §§ 1342(a).  Section 301(a)

9   prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued

10  pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

11      43.    Citizen enforcement is expressly authorized under Section 505(a)(1) and Section

12  505(f) of the Act against any "person," including individuals, corporations, or partnerships, for

13  violations of the Act.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive

14  relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject

15  to an assessment of civil penalties of $27,500 per day per violation for all violations occurring

16  before March 15, 2004 and $32,500 per day per violation of the Act, pursuant to Section

17  309(d), 33 U.S.C. § 1319(d), and 40 C.F.R. §§ 19.1 - 19.4 (pp. 200-202).  Lastly, Section

18  505(d) of the Act, 33 U.S.C. § 1365(d), permits prevailing, or substantially prevailing, parties

19  to recover fees and costs expended in citizen enforcement of the Act.

20      44.    Section 402(p) of the Act establishes a framework for regulating municipal and

21  industrial storm water discharges under the NPDES program.  33 U.S.C. §1342(p).  States with

22  approved NPDES permit programs are authorized by Section 402(p) to regulate industrial

23  storm water discharges through individual permits issued to dischargers and/or through the

24  issuance of a single, statewide general permit applicable to all industrial storm water

25  dischargers.  33 U.S.C. § 1342.

26      45.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

27  U.S. EPA has authorized California's State Board to issue NPDES permits including general

28

NPDES permits in California.

**B.      The Industrial Storm Water Permit**

46.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Industrial Storm Water Permit on or about November 19, 1991, modified the Permit on or about September 17, 1992, and reissued the Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

47.     Discharge Prohibition A(1) of the General Industrial Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the Permit prohibits storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

48.     Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impacts human health or the environment.

49.     Receiving Water Limitation C(2) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedence of an applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

50.     The General Industrial Storm Water Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

51.     Effluent limitation (B)(3) of the General Industrial Storm Water Permit requires facility operators to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of

1   Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best

2   Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

3       52.    The EPA has established benchmark values for certain pollutants, the exceedance

4   of which is considered a level of concern. 65 Fed. Reg. 64766. The level of concern is a

5   concentration at which a storm water discharge could potentially impair, or contribute to

6   impairing, water quality or affect human health from ingestion of water or fish. *Id*. Thus, the

7   benchmark values provide an appropriate level to determine whether a facility's storm water

8   pollution prevention measures are successfully implemented. *Id*. at 64766-67. EPA has

9   established the following benchmark values for pollutants in or likely to be in Defendants'

10  discharges, including but not limited to: pH – 6.0-9.0; TSS – 100 mg/L; oil & grease – 15.0

11  mg/L; carbon oxygen demand ("COD") – 110 mg/L; zinc – 0.117 mg/L;[3] aluminum – 0.750

12  mg/L; arsenic – 0.16854 mg/L; copper – 0.0636 mg/L; iron – 1.0 mg/L; lead – 0.816 mg/L;

13  mercury – 0.0024 mg/L; nitrate + nitrite ("N+N") – 0.68 mg/L; ammonia – 19.0 mg/L; and

14  biological oxygen demand ("BOD") – 30.0 mg/L (5-day). 65 Fed. Reg. 64767 (Table 3).

15      53.    Section A(1) and Provision E(2) of the General Industrial Storm Water Permit

16  require dischargers to have developed and implemented a Storm Water Pollution Prevention

17  Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all

18  the requirements of the Permit.

19      54.    The objective behind the SWPPP requirements is to identify and evaluate sources

20  of pollutants associated with industrial activities that may affect the quality of storm water

21  discharges from the Facility, and identify and implement site-specific Best Management

22  Practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm

23  water discharges. General Industrial Storm Water Permit, Section A(2).

24      55.    To ensure its effectiveness, Section A(9) of the General Industrial Permit requires

---

[3] The State Board has proposed adding a benchmark level for specific conductance of 200 µmho/cm and for total organic carbon of 110 mg/L. *See* Draft General Industrial Storm Water Permit (California State Water Board, December 2004), at 25 (Table VIII.2).

1   the SWPPP to be evaluated on an annual basis, and it must be revised as necessary to ensure

2   compliance with the Permit.  General Industrial Storm Water Permit Section A(9), (10).

3       56.     Sections A(3) through A(10) of the General Industrial Storm Water Permit set

4   forth the requirements for a SWPPP.

5       57.     The SWPPP must include a site map showing the facility boundaries, storm water

6   drainage areas with flow patterns, nearby water bodies, the location of the storm water

7   collection, conveyance and discharge system, structural control measures, areas of actual and

8   potential pollutant contact, and areas of industrial activity.  General Industrial Storm Water

9   Permit, Section A(4).

10      58.     The SWPPP must also include a list of significant materials handled and stored at

11  the site (General Industrial Storm Water Permit, Section A(5)); a description of potential

12  pollutant sources including industrial processes, material handling and storage areas, and dust

13  and particulate generating activities; a description of significant spills and leaks; a list of all

14  non-storm water discharges and their sources; a description of locations where soil erosion may

15  occur (General Industrial Storm Water Permit, Section A(6)); and an assessment of potential

16  pollutant sources at the facility and a description of the BMPs to be implemented at the facility

17  that will reduce or prevent pollutants in storm water discharges and authorized non-storm water

18  discharges, including structural BMPs where non-structural BMPs are not effective (General

19  Industrial Storm Water Permit, Sections A(7) and (8)).

20      59.     The General Industrial Storm Water Permit requires dischargers commencing

21  industrial activities before October 1, 1992 to develop and implement an adequate written

22  Monitoring and Reporting Program ("MRP") no later than October 1, 1992.  Existing facilities

23  covered under the Permit must implement all necessary revisions to their monitoring programs

24  no later than August 1, 1997.

25      60.     Sections B(3) through B(16) of the General Industrial Storm Water Permit set

26  forth the M&RP requirements. The objective of the MRP is to ensure that storm water

27  discharges are in compliance with the Industrial Permit's Discharge Prohibitions, Effluent

28

Limitations, and Receiving Water Limitations.  General Industrial Storm Water Permit, Section B(2).  The MRP must ensure that BMPs utilized at the facility are reducing or preventing pollutants in storm water discharges, and are evaluated whenever appropriate.  General Industrial Storm Water Permit, Section B(2)(a).

61.    Section B(3) of the General Industrial Storm Water Permit requires dischargers to conduct visual observations for the presence of unauthorized non-storm water discharges on a quarterly basis, to document the source of any discharge, and to report the presence of any discolorations, stains, odors or floating materials in the discharge.

62.    Section B(4) of the General Industrial Storm Water Permit requires dischargers to visually observe storm water discharges at all discharge locations from one storm event per month during the wet season (October 1 - May 30) and to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants.

63.    Sections B(3)(d) and B(4)(c) of the General Industrial Storm Water Permit require dischargers to maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges.

64.    Section B(5) of the General Industrial Storm Water Permit requires dischargers to collect a sample from all discharge points during the first storm event of the wet season and during at least one other storm event of the wet season, for a total of two samples per wet season.

65.    Section B(5)(c) of the General Industrial Storm Water Permit requires dischargers to analyze each sample for pH, specific conductance, total suspended solids ("TSS"), and TOC (or oil and grease), in addition to any applicable parameters listed on Table D of the Permit and any toxic chemicals or other pollutants likely to be present in significant quantities in the storm water discharged from the Facility.

66.    Dischargers must submit signed and certified "Annual Reports" to the Regional

Board by July 1 of each year.  General Industrial Permit, Section B(14).

## C.    The North Coast Basin Plan

67.    The State Water Quality Control Board, North Coast Region, has issued the Water Quality Control Plan for the North Coast Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies.  The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."  The Basin Plan also provides that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms."  The Basin Plan also establishes that the dissolved oxygen levels of the stretch of the Russian River to which the Facility discharges may not be depressed below 7.0 mg/L.  Basin Plan, Table 3-1.  The Basin Plan sets forth water quality objectives for dissolved metals, such as arsenic, lead, and mercury. *Id.*, Table 3-4.  The Basin Plan also states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id.*

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Develop and Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

68.    Plaintiff realleges and incorporates the preceding Paragraphs, as if fully set forth herein.

69.    The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BMPs that achieve compliance with BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

70.    Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of Effluent Limitation B(3) of the General Permit.

---

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE              18
RELIEF & CIVIL PENALTIES

CASE NO. 3:07-cv-05393-JCS

71.     Each day since August 16, 2002 that Defendants have failed to develop and implement BMPs to achieve compliance with BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

72.     Defendants have been in violation of the BAT/BCT requirements every day since at least August 16, 2002.  Defendants continue to be in violation of the BAT/BCT requirements each day that they fail to develop and implement BMPs meeting the BAT and BCT requirements for the Facility.

73.     An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

Wherefore Plaintiffs prays judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION
### Failure to Develop and Implement An Adequate
### Storm Water Pollution Prevention Plan
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

74.     Plaintiff realleges and incorporates the preceding Paragraphs, as if fully set forth herein.

75.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

76.     Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' discharges of storm water and non storm water in violation of Permit terms.

77.     Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to revise the Facility's SWPPP in response to the analytical results of the Facility's storm

water monitoring.

78.   Each day since October 1, 1992 that Defendants have failed to develop and implement, and revise as required, an adequate SWPPP for the Facility is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

79.   Defendants have been in violation of the SWPPP requirements every day since October 1, 1992. Defendants continue to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

80.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

Wherefore Plaintiffs prays judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
**Failure to Adequately Develop and Implement a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

81.   Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

82.   Section B of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement a MRP (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

83.   Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility. Defendants' ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to monitor for requisite pollution parameters, to conduct the necessary visual observations each month of each wet season, and to submit true and correct evaluation reports to the Regional Board.

84.   Each day since October 1, 1992 that Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the

General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of the requisite monitoring and analytical results are ongoing and continuous violations of the Act.

85.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

Wherefore Plaintiffs prays judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water and Unauthorized Non-Storm water
#### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311(a), 1342)

86.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

87.    Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

88.    Plaintiff is informed and believes, and thereupon alleges, that since at least August 16, 2002, Defendants have been discharging polluted storm water from the Facility directly to Oat Valley Creek, which flows to the Russian River, in violation of the Discharge Prohibitions and Receiving Water Limitations of the General Permit.

89.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

90.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

91.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing and/or contributing to violations of the applicable water quality standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

92.     Every day since at least August 16, 2002, that Defendants have discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

93.     An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

Wherefore Plaintiffs prays judgment against Defendants as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Failure to File Timely and Accurate Annual Reports as Required by the Permit**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

94.     Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

95.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have falsely certified compliance with the General Permit in each of the Annual Reports submitted to the Regional Board since at least August 16, 2002.

96.     Each day since at least August 16, 2002 that Defendants have failed to file timely, complete and accurate Annual Reports is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants continue to be in violation of the General Permit's certification requirement each day that it fails to timely, complete and accurate

Annual Report in violation of Permit terms.

97.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

Wherefore Plaintiff prays judgment against Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION
### Unpermitted Discharges of Pollutants to Waters of the United States
### in Violation of the Clean Water Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

98.    Plaintiff incorporates and realleges the preceding paragraphs as though fully set forth herein.

99.    Plaintiffs are informed and believe, and thereon allege, that Defendants have discharged and continue to discharge pollutants from the Facility to waters of the United States without an NPDES permit.

100.    Plaintiffs are informed and believe, and thereon allege, that Defendants have been in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for their unpermitted discharges of pollutants to waters of the United States every day since at least August 16, 2002.

101.    Plaintiffs are informed and believe, and thereon allege, that Defendants have been in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for their unpermitted discharges of pollutants to waters of the United States every day since they became the owner and/or operator of the Facility.

102.    Defendants have been and will continue to be in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), each day they operate without an NPDES Permit for the discharge of pollutants to waters of the United States.

103.    Discharging pollutants to waters of the United States without an NPDES Permit is an ongoing violation of the Clean Water Act.

104.    Each day that Defendants operate without NPDES Permit coverage for discharges of

pollutants from the Facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

105.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs prays judgment against Defendants as set forth hereafter.

## V.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.    Enjoin Defendants from discharging polluted storm water and non-storm water from the Facility unless in compliance with the Permit and the Act;

c.    Enjoin Defendants from further violating the substantive and procedural requirements of the Permit and the Act;

d.    Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that satisfy BAT or BCT standards as applicable and prevent pollutants in the facility's storm water from contributing to violations of any applicable water quality standards;

e.    Order Defendants to provide Plaintiff with reports documenting the quality and quantity of its discharges to waters of the United States and its efforts to comply with the Act and the Court's orders;

f.    Order Defendants to pay civil penalties of $27,500 per day per violation for all violations occurring before March 15, 2004, and $32,500 per day per violation for all violations occurring after March 15, 2004, for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

g.    Order Defendants to take appropriate actions to restore the quality of navigable waters impaired or adversely affected by its activities;

1

2

h.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

3

i.  Award any such other and further relief as this Court may deem appropriate.

4

5

6

Dated:  October 31, 2007          Respectfully submitted,
                                  LAW OFFICES OF ANDREW L. PACKARD
                                  LAWYERS FOR CLEAN WATER, INC.

7

8

9

By: /s/ Michael Lynes_____
        Michael Lynes
        Attorneys for Plaintiff
        Russian Riverkeeper

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



August 16, 2007


**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Redwood Empire Sawmill
PO Box 156
Cloverdale, California 95425

Pacific States Industries, Inc.
2 West Santa Clara Street, 9th Floor
San Jose, California 95113

North Cloverdale Blvd., LLC
2 West Santa Clara Street, 9th Floor
San Jose, California 95113

Nolan Schweikl
Operations Manager
Redwood Empire Sawmill
31401 McCray Road
Cloverdale, California 95425


**Re:    Notice of Violations and Intent to File Suit Under the Federal Water**
**Pollution Control Act**

Dear Sirs:

    I am writing on behalf of the Russian Riverkeeper ("Riverkeeper") in regard to violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "the Act") occurring at the Redwood Empire Sawmill located at 31401 McCray Road in Cloverdale, California, 95425, Parcel No. APN 115-150-26-0 ("the Facility"). Information available to Riverkeeper indicates that Redwood Empire Sawmill is a division of Pacific States Industries, Inc. Portions of the property on which the Facility is located are owned by Pacific States Industries and by North Cloverdale Blvd., LLC. This letter is being sent to Redwood Empire Sawmill, Pacific States Industries, Inc., and North Cloverdale Blvd., LLC as the responsible owners and/or operators of the Facility (hereafter "Redwood Empire" or "You" or "Your").

    This letter addresses Redwood Empire's unlawful discharges of pollutants from the Facility to Oat Valley Creek, which discharges into the Russian River. Specifically, this letter addresses Your ongoing violations of the substantive and procedural

requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Industrial Storm Water Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("General Industrial Storm Water Permit" or "Permit").

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act, 33 U.S.C. § 1365(a), a citizen must give notice of intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), the Regional Administrator for the EPA for the region in which such violation is alleged to have occurred, and the Chief Administrative Officer of the water pollution control agency for the State in which the violation is alleged to have occurred. 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1).

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit ("Notice Letter") provides notice of the violations that have occurred and continue to occur at the Facility. Consequently, Redwood Empire is hereby placed on formal notice by Riverkeeper that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, Riverkeeper intends to file suit in federal court against Redwood Empire under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), for violations of the Clean Water Act and the General Industrial Storm Water Permit. These violations are described more fully below.

## I.   Background

### A.   Russian Riverkeeper

Russian Riverkeeper is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife and natural resources of the Russian River and its tributaries. Riverkeeper's members live near and recreate in and around the Russian River and its tributaries. Riverkeeper's mission is to preserve, protect, and enhance the water quality, native fisheries, and wildlife of the Russian River watershed. To further these goals, Riverkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

Members of Riverkeeper use and enjoy the Oat Valley Creek and the Russian River and its tributaries into which pollutants from Redwood Empire's ongoing illegal activities are discharged. Members of Riverkeeper use the Russian River and its tributaries to fish, sail, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study including monitoring activities. The discharge of pollutants from the Facility impairs each of these uses. Thus, the interests of Riverkeeper's members have been, are being, and will continue to be adversely affected by Redwood Empire's failure to comply with the Clean Water Act and the General Industrial Storm Water Permit.

### B.    Redwood Empire Sawmill

Information available to Riverkeeper indicates that the Facility is located at 31401 McCray Rd., Cloverdale, CA 95425 and the Facility's mailing address is listed as PO Box 156, Cloverdale, CA 95425. Riverkeeper is informed and believes that Pacific States Industries, Inc.[1] ("Pacific States") is doing business as "Redwood Empire" and/or "Redwood Empire Sawmill." Information available to Riverkeeper indicates that Pacific States is the owner and/or operator of the Facility. Information available to Riverkeeper indicates that Roger A. Burch is the President and Registered Agent of Pacific States and that Nolan Schweikl is the Facility's General Manager. Pacific States maintains offices at 2 West Santa Clara St. 9th Floor, San Jose, CA 95113. Information available to Riverkeeper indicates that Pacific States holds title to APN 115-150-069 on which a portion of the Facility is located. Additionally, North Cloverdale Blvd., LLC, holds title to APN 115-150-045 on which a portion of the Facility is located. Information available to Riverkeeper indicates that Richard A. Burch is also the Registered Agent for North Cloverdale Blvd., LLC at 2 West Santa Clara St. 9th Floor, San Jose, CA 95113. Pacific States, Redwood Empire Sawmill and North Cloverdale Blvd. LLC are the owners and/or operators of the Facility and are therefore liable for the Clean Water Act violations alleged in this Notice Letter.

Information available to Riverkeeper indicates that the Facility includes a sawmill, planer, kiln, remanufacturing facility, fuel storage, and at least six acres of unpaved log deck. Information available indicates that there is also an ammonia storage tank, for when Redwood Empire applies ammonia to sawdust to use as a soil amendment. Based on Russian Riverkeeper's review of available documents, Redwood Empire has reported to the Regional Water Quality Control Board for the North Coast ("Regional Board") that the Facility is classified under Standard Industrial Classification Codes 2411 ("Log Storage and Handling"), 2421 ("General Sawmill/Planing Mill") and 2499 ("Wood products, not classified elsewhere"). On or about April 16, 1992 and again on or about May 7, 1997, Redwood Empire submitted its notice of intent to comply with the terms of the General Industrial Storm Water Permit ("Notice of Intent to Comply" or "NOI"). The Facility was assigned the WDID identification number 1495006163. Redwood Empire has purported to be in compliance with the General Industrial Storm Water Permit for at least each of the past five years. As demonstrated herein, that is not the case.

Redwood Empire conducts industrial activities that include the loading and unloading, processing, storage, and transfer of lumber, wood products, and associated industrial materials. Information available to Riverkeeper indicates that the northern and southern portions of the Facility are primarily used for lumber storage and processing and

---

[1] Riverkeeper is informed and believes that Redwood Empire Inc. was the owner and/or operator of the facility in the late 1980's. However, information available to Riverkeeper indicates that Redwood Empire, Inc., merged into Pacific States in 1989. If Redwood Empire, Inc., still owns and/or operates the Facility or owns the land on which the Facility is located then this Notice Letter is being sent to Redwood Empire, Inc., as an owner and/or operator of the Facility.

Notice of Violation and Intent To File Suit
August 16, 2007
Page 4 of 17

that the middle section of the property contains several buildings, including at least ten
structures that contain most of the milling, chemical storage, and office space.  Redwood
Empire's Notice of Intent to Comply with the General Permit, filed in 1997, states that
the property is 24 acres and 10% paved or covered with impervious structures.  Redwood
Empire's Storm Water Pollution Prevention Plan ("SWPPP") dated January 2000 states
that the property covers approximately 30 acres and is 70% paved or covered with
impervious structures.  Information available to Russian Riverkeeper indicate that
operations at the Facility occur outside, without cover, or without other Best Management
Practices ("BMPs") to prevent the exposure of pollutants to storm water at the site.
Additionally, information available to Riverkeeper indicates that Redwood Empire has
not adequately develop and/or implemented BMPs that would prevent the contaminated
storm water from discharging from the Facility.

According to Redwood Empire's SWPPP and self-monitoring reports, storm
water discharges from the Facility through two discharge points to Oat Valley Creek.
Information available to Riverkeeper indicates that storm water is discharged from other
locations at the Facility, including but not limited to, through broken berms and other
inadequate BMPs that have resulted in the discharge of collected storm water and/or
process wastewater.  Additionally, information available to Riverkeeper indicates that
Redwood Empire also discharges non-storm water from the east-southeast side of the
Facility near a large metal tank.  All of the storm water and non-stormwater discharges at
the Facility go into Oat Valley Creek, which travels less than a mile before emptying into
the Russian River.  Redwood Riverkeeper is informed and believes that pollutants
discharged from the site include, but are not limited to: fugitive sawdust, wood debris,
and sediment; metals; biological and industrial wastes; ammonia; nitrites and nitrates;
oxygen-demanding substances; lubricants, fuels and other fluids and toxic chemicals
associated with Redwood Empire's operations including but not limited to the
maintenance of large trucks, lifts and other heavy machinery and vehicles.

In addition to coverage under the General Industrial Storm Water Permit,
Redwood Empire is regulated by waste discharge requirements issued by the Regional
Board, Order No. 89-76 ("the Order"), which describes several beneficial uses for the
Russian River and ground water near the Facility and sets forth certain prohibitions
concerning discharges from the Facility.[2]  Section A of the Order sets forth several
prohibitions, including Discharge Prohibitions.  Redwood Empire violates the Order if it
discharges waste to land not controlled by Redwood Empire, or discharges wood
treatment chemicals, woody debris, or water carrying earthen materials or wood waste,
except during rainfall or 36 hours thereafter.  Section B of the Order also establishes
several Receiving Water Limitations, including: the Dissolved Oxygen of the receiving
water may not be depressed below 7.0 mg/L, the pH must remain between 6.5-8.5;
turbidity must not be increased 20% over its natural level; and discharges must not cause
discoloration, bottom deposits, undesirable odors or tastes in aquatic life, or create foams,

---

[2] Redwood Empire renewed its application most recently on May 18, 2000.

scums, or other visible coatings. Order, at 3-4. Moreover, discharges shall not violate any water quality standards. *Id*. at 4.

On July 8, 2003, Regional Board staff sent Redwood Empire a letter stating that it had received several complaints that storm water was being discharged to Oat Valley Creek from two locations at the Facility. One observer noted that the Facility's berm abutting Oat Valley Creek had been cut to allow storm water to discharge directly into the Creek. The second complainant came from a game warden with the California Department of Fish & Game ("DFG") who observed "a dark black discharge" from the steel storm water collection basin from which the Facility discharges storm water to the creek. In water samples collected in Oat Valley Creek near the Facility, DFG detected levels of turbidity and dissolved oxygen resulting from discharges from the Facility that violated the Receiving Water Limitations set forth in Section B of WDR Order No. 89-76.

The Regional Board's July 8 Letter concludes that Oat Valley Creek is severely affected by runoff from the Facility. Riverkeeper is informed and believes that violations of WDR Order No. 89-76 are also evidence that Redwood Empire is in violation of the Permit including but not limited to that Redwood Empire has failed to develop and implement adequate BMPs to achieve BAT/BCT and to comply with applicable water quality standards. In 2003, DFG personnel collected water samples in Oat Valley Creek near the Facility. In its samples, DFG detected turbidity levels of 4630 NTU and 3592 NTU at the Facility's discharge points. These levels indicate a net increase in turbidity of far greater than 20% over the turbidity of 365 NTU detected upstream from the Facility, in violation of Section 3.30 of the Basin Plan. DFG's tests also indicate that discharges from the Facility depress the dissolved oxygen levels of Oat Valley Creek. DFG detected a level of dissolved oxygen upstream from the Facility of 8.0 mg/L, but a level of dissolved oxygen of 3.5 mg/L downstream from the Facility. These discharges violate Receiving Water Limitation B(1) of the Order and are below the standard set by Table 3-1 of the Basin Plan, which state that discharges from the Facility may not depress the dissolved oxygen of the receiving water below 7.0 mg/L. Riverkeeper believes that the discharge sampling results are indicative of the quality of storm water and/or non-stormwater that is discharged from the Facility. Based on its findings, the Regional Board requested an explanation for the violations from Redwood Empire and that Redwood Empire provide a report of discharge and an updated SWPPP by July 25, 2003.

Redwood Empire responded to the July 8th letter on July 18, 2003. Redwood Empire provided its 2000 SWPPP without updates and provided a brief "technical report" regarding BMPs purportedly implemented to prevent discharges of the type described in the Board's July 8 Letter. In its response, Redwood Empire claimed to implement the following BMPs: (1) a cement K-rail wall was installed to prevent run-off from the Facility directly to the creek; (2) woody debris discharged from the Facility had been cleaned up; (3) the creek bank adjacent to the Facility had been "seeded" with grass and covered with straw; and (4) the employee responsible for the violations had been suspended without pay. However, some of these BMPs do not address the causes of the

discharges.  In any event, sampling of storm water discharges subsequent to the purported implementation of these BMPs demonstrates that the Facility continues to discharge storm water containing elevated levels of pollutants.  *See* Attachment B to this Notice Letter, *Specific Examples of Discharges in Violation of General Industrial Storm Water Permit, Redwood Empire (Cloverdale, CA) August 16, 2002 – August 16, 2007.*

As the information in Attachment B demonstrates, the illegal discharges from the Facility are ongoing and Redwood Empire's BMPs are ineffective to achieve the requirements of the Permit because they are either inadequately developed to prevent or reduce pollutant levels in discharges and/or because they are inadequately implemented and/or maintained.  Further, conditions observed at the Facility are inadequate to reduce the exposure of storm water to pollutants and/or to contain or treat storm water before it is discharged from the Facility.  For example, Russian Riverkeeper's investigators have observed and photographed several gaps in the cement-K-rail wall that permit run-off of polluted storm water from the Facility to flow directly to Oat Valley Creek.  Several of the stored and cut logs hang over the K-rail containment BMP and discharge storm water directly to the creek.   Investigators have also observed woody debris, tannins, and other pollutants in Oat Valley Creek as a result of continuing discharges from the Facility.  Redwood Empire's violations of the General Industrial Storm Water Permit and the negative impacts their illegal discharges have on Oat Valley Creek and the Russian River must be abated.

## C.    The Russian River

The Russian River watershed is approximately 100 miles long and from 12 to 32 miles wide, and drains an area of 1,485 square miles.  The headwaters of the Russian River is about 16 miles north of Ukiah, and flows southward for 90 miles through Redwood, Ukiah, Hopland, and Alexander Valleys, and through the northwestern part of the Santa Rosa Plain, before entering the Pacific Ocean at Jenner.  The principal tributaries of the Russian River are East Fork, Sulphur Creek, Mayacama Creek, Dry Creek, and Mark West Creek.  Oat Valley Creek, which runs along the north-eastern edge of the Facility, joins the Russian River in Cloverdale.

The Russian River is home to three species of salmonids: coho salmon, chinook salmon and steelhead trout.  All three species have experienced severe population declines and are listed as threatened under the Endangered Species Act, with coho listed as endangered under the California Endangered Species Act.  The Russian River is also home to other threatened and endangered species, including but not limited to, freshwater shrimp (Federally Endangered/State Endangered); Western pond turtles (California Species of Concern); western tailed frogs (California Species of Concern); California tiger salamanders (Federally Proposed for Listing/State Species of Concern): and foothill yellow-legged frogs (California Species of Concern) that inhabit streams with gravel or sandy bottoms and sunny banks.  Further, frogs, salamanders, snakes, muskrats, beavers, and river otters live in the watershed.  Various trees grow along the stream banks and attract large numbers of resident and migratory birds.  An entangling understory of

Notice of Violation and Intent To File Suit
August 16, 2007
Page 7 of 17

shrubs, flowering plants, and vines provides sites for nesting, shelter and shade for many animals. Algae and mosses proliferate in the water and on rocks. Leaves swept into the current decompose, adding nutrients and organic matter to waterways. Insects thrive here and in turn provide an abundant food source for invertebrates, fish, and birds. *California Coastal Commission's California Coastal Resource Guide*, at http://ceres.ca.gov/ceres/calweb/coastal/streams.html ("CCC Online Coastal Resource Guide: Streams") Riverkeeper is informed and believes that salmonids also spawn or attempt to spawn in Oat Valley Creek near the Facility; other threatened or endangered species and other wildlife also make use of Oat Valley Creek in areas downstream from the Facility.

The North Coast Regional Board's Water Quality Control Plan ("Basin Plan") designates numerous beneficial uses for the Russian River.[3] Beneficial uses are intended to represent the purposes of the water body that are specifically protected by the Clean Water Act. When those uses are not attained, the Regional Board designates the water body as impaired under Section 303(d) of the Clean Water Act. The North Coast's 303(d) list indicates that the Russian River is impaired for sediment/siltation and temperature on the entire river, and low dissolved oxygen, nitrogen, phosphorous, and pathogens on some reaches of the river. Therefore, the receiving waters of pollution from the Facility are impaired, and illegal discharges of pollution contribute to the continued impairment of the Russian River.

Coastal creeks and rivers in California are precious resources, and Redwood Empire's actions threaten these resources. "On their way to the ocean, California's coastal streams and rivers flow through the canyons and valleys of coastal mountains, linking forest, chaparral, scrubland, grassland, and marsh. Riparian woodlands develop along stream banks and floodplains, and coastal wetlands and estuaries form where the rivers enter the sea. Rivers transport nutrients, sediments, and oxygen through the watershed, and life flourishes in their path." (*CCC Online Coastal Resources Guide: Streams.*) Coastal rivers and the adjacent estuarine and riparian habitats throughout California support a wide variety of flora, fauna, and habitat that are directly affected by Redwood Empire's discharges of pollutants into the Russian River. In addition, with every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from Russian River Basin industries such as Redwood Empire Sawmill, pour into storm drains and into the Russian River. The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the marine and river environments each year. Contaminated stormwater

---

[3] According to the Basin Plan, the Russian River's beneficial uses include: municipal; agriculture, industrial, groundwater (in some reaches of the river); freshwater; navigation; hydroelectric power (potential); water contact recreation, non-water contact recreation, commercial and sport fishing; warm freshwater habitat; cold freshwater habitat; spawning, reproduction, and/or early development; wildlife habitat; rare and endangered species; migration of aquatic organisms; and estuarine habitat (in some reaches of the river). *Water Quality Control Plan, North Coast Region*, Regional Water Quality Control Board, North Coast Region, Table 2-1 (2006).

discharges can and must be eliminated in order for the Russian River area aquatic ecosystem to have a fighting chance at regaining its health.

## II.    Statutory and Regulatory Framework

### A.    The Clean Water Act

Under the Clean Water Act section 301(a) the discharge of any pollutant to a water of the United States is prohibited unless the discharge is in compliance with, among other things, section 402 of the CWA.  *See* 33 U.S.C. §1311(a).  Section 402 of the Clean Water Act and its implementing regulations require that any person who discharges or proposes to discharge pollutants to waters of the United States submit a National Pollutant Discharge Elimination System ("NPDES") permit application to the State Water Resources Control Board ("State Board").  33 U.S.C. § 1342(p)(2)(b); 40 C.F.R. §§ 122.21(a), 122.26(a)(ii).  Further, dischargers of storm water associated with industrial activity are required to obtain either an individual NPDES permit or seek coverage under the General Industrial Storm Water Permit.[4]  *See* 40 C.F.R. § 126(c)(1).

### B.    General Industrial Storm Water Permit

The General Industrial Storm Water Permit contains several discharge prohibitions, effluent limitations, receiving water prohibitions, and requirements to develop a SWPPP and a monitoring and reporting program with which all facilities requiring coverage must comply.   Discharge Prohibition A(2) of the General Permit prohibits stormwater discharges and authorized non-stormwater discharges which cause or threaten to cause pollution, contamination, or nuisance.   Discharge Prohibition A(1) and Special Condition D(1) of the General Permit prohibit the discharge of material other than stormwater (i.e. non-stormwater discharges) to a storm sewer system or waters of the nation, except under limited specified circumstances.   Unauthorized non-stormwater discharges must either be separately permitted or eliminated.

Effluent Limitation B(3) of the General Industrial Storm Water Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  BMPs necessary to achieve compliance with BAT and BCT include both nonstructural and structural measures.  General Industrial Storm Water Permit, Section A(8).  The EPA has established Benchmark levels that indicate whether a facility discharging industrial storm water has implemented the requisite BAT

---

[4]  In certain circumstances, such as when the discharge of non-storm water is either unauthorized or is authorized but contributes to a violation of water quality standards, the discharger must obtain a permit for both discharges.  *See* Industrial Storm Water Permit, Fact Sheet.  It is possible that this requirement could be met by obtaining an individual NPDES permit that contains storm water provisions.  *Id.*

Notice of Violation and Intent To File Suit
August 16, 2007
Page 9 of 17

and BCT . The following levels are some of the benchmarks that have been established for pollutants in or likely to be in Redwood Empire's discharges: pH – 6.0-9.0; total suspended solids ("TSS") – 100 mg/L; oil & grease – 15.0 mg/L; carbon oxygen demand ("COD") – 110mg/L; and zinc – 0.117 mg/L;[5] aluminum – 0.750 mg/L; arsenic – 0.16854 mg/L; copper – 0.0636 mg/L; iron – 1.0 mg/L; lead – 0.816 mg/L; mercury – 0.0024 mg/L; nitrate+nitrite ("N+N") – 0.68 mg/L; ammonia – 19.0 mg/L; biological oxygen demand ("BOD") – 30.0 mg/L (5-day). 65 Fed. Reg. 64767 (Table 3).

Receiving Water Limitation C(1) of the General Permit prohibits stormwater discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) prohibits stormwater discharges and authorized non-stormwater discharges which cause or contribute to an exceedance of applicable water quality standards, such as the California Toxics Rule ("CTR"), 40 C.F.R. § 131.38, or the applicable Basin Plan.[6] A discharger that causes or contributes to a violation of applicable water quality standards must implement more stringent controls necessary to meet such water quality standards. General Industrial Storm Water Permit, Receiving Water Limitation C(2).

The General Industrial Storm Water Permit also requires that dischargers develop and implement a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all of the requirements of the Permit. General Industrial Storm Water Permit, Section A(1) and Provision E(2). The objective behind the SWPPP requirements is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater discharges from the Facility, and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater discharges. General Industrial Storm Water Permit, Section A(2). To ensure its effectiveness, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A(9), and must be revised as necessary to ensure compliance with the Permit. General Industrial Storm Water Permit, Section A(9), (10). Section A(9) requires dischargers conduct an Annual Comprehensive Site Compliance Evaluation, which includes: (a) review of all monitoring data; (b) visual inspection of all potential pollutant sources at the facility; (c) evaluation of all BMPs to determine their adequacy and whether additional BMPs are necessary; and (d) preparation of an evaluation report. The evaluation report must be submitted with the Annual Report and must include: (a) the identity of the personnel who performed the evaluation; (b) necessary revisions to the SWPPP and a schedule for implementation of the revisions; (c) descriptions of any incidents of noncompliance and corrective actions taken; and (e) a certification that the facility is in compliance with the General Permit. Section A(9)(d). The evaluation report must be submitted with the annual report. *Id.*

---

[5] The State Board has proposed adding a benchmark level for specific conductance of 200 μmho/cm and for total organic carbon ("TOC") of 110 mg/L. *See* Draft General Industrial Storm Water Permit (California State Water Board, December 2004), at 25 (Table VIII.2).

[6] The numeric criteria found in the CTR apply to Redwood Empire's discharges at the point of discharge, or end-of-pipe. *See* 40 C.F.R. § 131.38(c)(2)(i).

Sections A(3) – A(10) of the General Industrial Storm Water Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a site map showing the facility boundaries, stormwater drainage areas with flow patterns, nearby waterbodies, the location of the stormwater collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-stormwater discharges and their sources and a description of locations where soil erosion may occur (Section A(6)). Sections A(7) and (8) require an assessment of potential pollutant sources at the facility and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges, including structural BMPs where non-structural BMPs are not effective.

The General Industrial Storm Water Permit requires facility owners and/or operators to develop and implement an adequate Monitoring Program and Reporting Requirements plan ("MRP") by October 1, 1992 or prior to the commencement of industrial activities at a facility. General Industrial Storm Water Permit, Section B(1) and Provision E(3). The objective of the MRP is to ensure that stormwater discharges are in compliance with the General Industrial Storm Water Permit's Discharge Prohibitions, Effluent Limitations and Receiving Water Limitations. General Industrial Storm Water Permit, Section B(2). The MRP must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility, and are evaluated and revised whenever appropriate. *Id.*, Section B(2).

Sections B(3) through B(16) of the General Permit set forth the MRP requirements. Specifically, Section B(3) of the General Permit requires dischargers to conduct quarterly dry season visual observations of all drainage areas within their facility for the presence of authorized and unauthorized non-stormwater discharges. Section B(4) requires dischargers to conduct visual observations of stormwater discharges from one storm event per month during the wet season (defined as October 1-May 30). Sections B(3) and (4) further requires dischargers to document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor and the source of any pollutants. Finally, dischargers must maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-stormwater discharges and to reduce or prevent pollutants from contacting non-stormwater and stormwater discharges. *Id.*, Sections B(3) and (4).

Sections B(5) and (7) of the Permit require dischargers to visually observe and collect samples of stormwater discharges from all locations where stormwater is discharged. Sample collection from all discharge points must occur during the first storm event of the wet season and during at least one other storm event of the wet season, for a total of two samples per wet season. *Id.*, Section B(5). Sampling of stored or contained

stormwater shall occur any time the stored or contained stormwater is released. *Id.* Stormwater samples shall be analyzed for total suspended solids ("TSS"), pH, specific conductance, total organic carbon ("TOC") or oil and grease, toxic chemicals and other pollutants that are likely to be present in the discharges, any other analytical parameters listed in Table D of the General Permit, or required by the Regional Board. *Id.*, Section B(5)(c). Finally, dischargers are also required to provide an explanation of monitoring methods describing how the facility's monitoring program will satisfy these objectives. *Id.*, Section B(10).

Section B(14) of the General Permit requires dischargers to submit an Annual Report to the Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report, an explanation of why a facility did not implement any activities required, and records specified in Section B(13). *Id.*, Section B(14). The Annual Report must be signed and certified by an appropriate corporate officer. General Industrial Storm Water Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Industrial Storm Water Permit, Sections C(9) and 10) and B(14). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

## C.    The North Coast Basin Plan

The Regional Board has established water quality standards for the Russian River in the Basin Plan. The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." The Basin Plan also provides that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms." The Basin Plan also establishes that the dissolved oxygen levels of the stretch of the Russian River to which the Facility discharges may not be depressed below 7.0 mg/L. Basin Plan, Table 3-1. The Basin Plan sets forth water quality objectives for dissolved metals, such as arsenic, lead, and mercury. *Id.*, Table 3-4. The Basin Plan also states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id.*

The Basin Plan dictates that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce significant alterations in population or community ecology or receiving water biota." *Id.* The Basin Plan further provides that dissolved oxygen levels in the Russian River will not exceed 7.0 mg/L. *Id.*

Notice of Violation and Intent To File Suit
August 16, 2007
Page 12 of 17

**III.    Redwood Empire is in Violation of the Clean Water Act and the General Industrial Storm Water Permit**

      **A.    Unpermitted Discharges of Pollutants in Violation of the Clean Water Act**

Riverkeeper is informed and believes that Redwood Empire discharges non-stormwater such as wastewater or process water from the east-southeast side of the Facility to Oak Creek, a water of the United States without an NPDES permit. Information available to Riverkeeper indicates that this is a continuous non-stormwater discharge and thus Redwood Empire must apply for, obtain and comply with an individual NPDES permit for these non-storm water discharges of pollutants that are in violation of and not authorized by the General Industrial Storm Water Permit.

Every day since August 16, 2002 that the Redwood Empire has discharged and continues to discharge non-storm water, or waste water, to Oak Valley Creek is a violation of the Clean Water Act.  These violations are ongoing and each day that Redwood Empire discharge pollutants without an NPDES permit constitutes a separate and distinct violation of the Clean Water Act.  Riverkeeper will include additional violations when information becomes available.  Redwood Empire is subject to civil penalties for violations of the CWA occurring from August 16, 2002.

      **B.    Discharges of Contaminated Storm Water and Unauthorized Non-Storm Water in Violation of the General Industrial Storm Water Permit**

Information available to Russian Riverkeeper indicates that Redwood Empire has neither developed nor implemented BMPs that will eliminate the discharge of contaminated storm water at the Facility as required by the Permit.  For example, Redwood Empire has discharged and continues to discharge stormwater with high levels of TSS, specific conductivity, TOC, COD, zinc and other pollutants associated with Your industrial operations at the Facility in violation of the General Industrial Storm Water Permit.  These high pollutant levels have been documented by Redwood Empire in Annual Reports submitted to the Board, and in storm water sampling conducted during significant rain events, including rain events indicated in the table of rain data attached hereto as Attachment A.

Redwood Empire has violated and will continue to violate Discharge Prohibition A(2)  and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit by discharging contaminated storm water  every day that storm water is discharged from the Facility,[7] including those events described in great detail in Attachment B to this Notice Letter.  In addition, as explained herein, Redwood Empire

---

[7] Storm water is discharged from the Facility on dates that include but are not limited to, when 0.1 inches of rain falls.

Notice of Violation and Intent To File Suit
August 16, 2007
Page 13 of 17

has discharged and continues to discharge non-storm water, or industrial process wastewater, in violation of Discharge Prohibition A(1) and Special Condition D(1) of the General Industrial Storm Water Permit.

Redwood Empire's Annual Reports confirm that Redwood Empire has known that its storm water discharges contain the above-listed pollutants at levels exceeding EPA benchmark values, Basin Plan objectives, CTR levels and other water quality criteria since at least August 16, 2002. Russian Riverkeeper alleges that such violations also have occurred and will occur whenever Redwood Empire discharges storm water during every significant rain event that has occurred since at least August 16, 2002, and that will occur at the Facility subsequent to the date of this Notice Letter. Attachment A, attached hereto, sets forth specific rain dates on which Russian Riverkeeper alleges that Redwood Empire has discharged contaminated storm water in violation of Discharge Prohibitions A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit. Redwood Empire has violated and will continue to violate Discharge Prohibition A(1) every day that Redwood Empire discharges unauthorized non-stormwater.

Riverkeeper is informed and believes that since at least August 16, 2002, Redwood Empire has been and continues to discharge storm water and unauthorized non-stormwater from the Facility in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit. Every day that Redwood Empire has discharged or continues to discharge storm water or unauthorized non-storm from the Facility in violation of the Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act. 33 U.S.C. §1311(a). Redwood Empire's violations will continue each day contaminated stormwater and/or unauthorized non-stormwater is discharged in violation of the requirements of the Permit. Redwood Empire is subject to civil penalties for violations of the CWA occurring from August 16, 2002.

C.    **Failure to Develop and/or Implement BMPs to Reduce or Eliminate Pollutants in Storm Water Discharges to Comply with the BAT and BCT in Violation with the General Industrial Storm Water Permit.**

Information available to Riverkeeper indicates that You have neither developed nor implemented BMPs that achieve compliance with BAT or BCT to reduce or prevent pollutants in storm water discharges. Therefore, Redwood Empire has violated and continues to violate the Permit during every significant rain event that You discharge polluted storm water in violation of the BAT/BCT requirement.

A review of its storm water monitoring data and a physical inspection of the Facility, as is required by the Permit, should have alerted Redwood Empire that it had failed to implement BMPs that achieved BAT/BCT at the Facility prior to the Regional

Notice of Violation and Intent To File Suit
August 16, 2007
Page 14 of 17

Board's letter of July 8, 2003. However, even after the Regional Board's letter and Redwood Empire's own response setting forth additional BMPs, Redwood Empire failed to implement adequate BMPs to achieve BAT/BCT at the Facility. For example, Russian Riverkeeper's investigation has revealed that the BMPs set forth in Redwood Empire's July 18, 2003 letter have been ineffective or were not fully implemented. Storm water sampling conducted by Redwood Empire since that time show that Redwood Empire continues to discharge storm water containing pollutants in violation of the BAT/BCT requirement.

Redwood Empire has violated and will continue to violate Effluent Limitation B(3) of the General Industrial Storm Water Permit by failing to develop and/or implement BMPs that achieve compliance with the BAT/BCT requirement. Redwood Empire has been and will continue to be in violation of the Permit every day that storm water has been or is discharged from the Facility in violation of the BAT/BCT requirement, including those events described in great detail in Attachment B.

Every day since August 16, 2002 that Redwood Empire fails to develop and/or implement BMPs that achieve BAT/BCT standards at the Facility is a separate and distinct violation of both the Storm Water Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a). Redwood has been in daily and continuous violation of the BAT/BCT requirements of the Storm Water Permit everyday since August 16, 2002. Redwood Empire's violations are ongoing and it will continue to be in violation every day it fails to develop and/or implement BMPs that satisfy the requirements of the BCT/BAT standard for reducing or preventing pollutants associated with industrial activity in discharges from the Facility. Riverkeeper will include additional violations when information becomes available. Redwood Empire is subject to penalties for all violations of the CWA occurring since August 16, 2002. .

> **D.**     **Failure to Develop and/or Implement an Adequate Storm Water Pollution Prevention Plan in Violation with the General Industrial Storm Water Permit.**

Redwood Empire's storm water sampling and Annual Reports, as well as Russian Riverkeeper's investigations, demonstrates that Redwood Empire has been operating with an inadequately developed and/or implemented SWPPP in violation of the Permit's requirements as set forth above. Redwood Empire has also failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Redwood Empire is also in ongoing violation of Section A(9) of the General Industrial Storm Water Permit because it has failed to conduct an annual site inspection and revision of the SWPPP (see Section F below). Redwood Empire has been in continuous violation of Section A(1) and Provision E(2) of the General Industrial Storm Water Permit every day since at least August 6, 2007, and will continue to be in violation every day that Redwood Empire fails to develop and/or implement an effective SWPPP. Redwood Empire is subject to penalties for violations of the Permit and the Act occurring since August 16, 2002.

**E.    Failure to Develop and/or Implement an Adequate Monitoring and Reporting Program in Violation of the General Industrial Storm Water Permit.**

Redwood Empire has failed and continues to fail to adequately develop and/or implement a MRP that meets the requirements of the Permit as set forth above. For example, Redwood Empire has failed to analyze its storm water samples for all pollutants that are "likely to be present in storm water discharges in significant quantities" including but not limited to aluminum, arsenic, copper, lead, mercury, nitrate+nitrite, ammonia, and biological oxygen demand and other pollutants associated with Your industrial activities at the Facility. General Industrial Storm Water Permit Section B(5)(c)(ii). Redwood Empire's ongoing failure to analyze its storm water samples for these and other pollutants likely to be present in its storm water discharges constitutes ongoing violations of the Permit and the Clean Water Act.

Redwood Empire has also failed to comply with Section B(4) by failing to conduct visual observations of every discharge point at the Facility at least once per month during each wet season during the past five years. Redwood Empire has failed to comply with Section B(5) by not sampling stored or contained storm water at any time the stored or contained storm water is released. *See* Section B(5). For example, Riverkeeper is informed that Redwood Empire has never sampled storm water collected in the metal basin prior to releasing it to Oak Valley Creek.

Each of Redwood Empire's failures to comply with the Permit's Section B mandatory monitoring requirements constitutes an ongoing violation of the Permit and the Clean Water Act Redwood Empire has been in violation of the MRP requirements since at least August 16, 2002 and will continue to be in violation of the Permit each day they fail to develop and/or implement an adequate MRP as required by the Permit. Redwood Empire is subject to penalties for these violations of the General Industrial Storm Water Permit and the Act since August 16, 2002.

**F.    Failure to Submit Required Reports for Discharges that are Causing and/or Contributing to Exceedances of Water Quality Standards or Are Otherwise in Violation of the General Industrial Storm Water Permit.**

As indicated above, Redwood Empire discharges storm water containing elevated levels of TSS, specific conductivity, COD, TOC, zinc and unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards. Based on Russian Riverkeeper's review of available documents, Redwood Empire was aware of high levels of many of these pollutants prior to August 16, 2002. As explained herein, Redwood Empire has continually violated the General Industrial Storm Water Permit since August 16, 2002 and yet has never filed a report of noncompliance pursuant to C(11)(d). Each day that Redwood Empire has failed to file such a report for each violation constitutes a separate violation of the General Permit and the Act.

Notice of Violation and Intent To File Suit
August 16, 2007
Page 16 of 17

Moreover, Section A(9) of the General Industrial Storm Water Permit requires dischargers conduct an Annual Comprehensive Site Compliance Evaluation. The Annual Comprehensive Site compliance Evaluation requires a complete review of all monitoring data and the SWPPP, an evaluation of potential revisions to the SWPPP, and preparation of an evaluation report. Redwood Empire is required to submit the evaluation report, which includes reports of incidents of noncompliance and corrective actions taken, with each Annual Report filed with the Regional Board. *See* General Industrial Storm Water Permit Section (A)(9); *see also* Redwood Empire's 2005-2006 Annual Report, page 6, Section I. Based on publicly available information Riverkeeper is informed and believes that Redwood Empire has failed to submit a complete Annual Comprehensive Site Compliance Evaluation report, including reports of incidences of noncompliance with the Permit, at any time since August 16, 2002.

Redwood Empire has been in continuous violation of Sections C(11)(d) and A(9) of the General Industrial Storm Water Permit every day since at least August 16, 2002, and will continue to be in violation every day that Redwood Empire fails to prepare and submit the requisite reports. Redwood Empire is subject to penalties for violations of the General Industrial Storm Water Permit and the Act occurring since August 16, 2002.

**G.    Failure to File Timely, True and Correct Annual Reports in Violation with the General Industrial Storm Water Permit.**

Information available to Riverkeeper indicates that Redwood Empire has failed to file Annual Reports by July 1 as required by the Permit and has also signed and submitted inaccurate Annual Reports and purported to comply with the General Industrial Storm Water Permit despite significant noncompliance at the Facility. For example, in each year that Redwood Empire submitted a signed and certified Annual Report to the Regional Board since at least August 16, 2002, Redwood Empire attested that it was in full compliance with the General Industrial Storm Water Permit despite the ongoing noncompliance described in this letter.

Redwood Empire has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Redwood Empire failed to submit an Annual Report and/or submitted an incomplete or incorrect Annual Report that falsely certified compliance with the Act. These violations are continuous and ongoing until Redwood Empire submits a complete and correct Annual Report for each year that Redwood Empire has been subject to the General Permit. Redwood Empire is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since August 16, 2002.

**III.    Persons Responsible for the Violations.**

Russian Riverkeeper puts You on notice that Redwood Empire Sawmill, Pacific States Industries, Inc., and North Cloverdale Blvd., LLC are the responsible owners,

and/or operators of the Facility and thus are responsible for the violations described above. If additional persons or entities are subsequently identified as also being responsible for the violations set forth above, Russian Riverkeeper puts You on notice that it intends to include those persons in this action.

**IV.     Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:

> Don McEnhill
> Russian Riverkeeper
> PO Box 1335
> Healdsburg, CA 95448
> Phone: (707) 433-1958

**V.     Counsel.**

Russian Riverkeeper has retained legal counsel to represent it in this matter. Please direct all communications to:

| | |
|---|---|
| Andrew L. Packard | Layne Friedrich |
| Michael P. Lynes | Michael J. Chappell |
| Law Offices of Andrew L. Packard | Lawyers for Clean Water, Inc. |
| 319 Pleasant Street | 1004-A O'Reilly Ave |
| Petaluma, CA 94952 | San Francisco, CA 94129 |
| (707) 763-7227 | Telephone: (415) 440-6520 ext. 200 |
| Andrew@packardlawoffices.com | Layne@lawyersforcleanwater.com |

**VI.     Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Redwood Empire to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, Russian Riverkeeper will seek declaratory relief and injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

Russian Riverkeeper believes this Notice Letter sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the Act against Redwood Empire and its agents for the above-referenced violations upon the expiration of the 60-day notice period. However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter. If you wish to

Notice of Violation and Intent To File Suit
August 16, 2007
Page 18 of 17

pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.


Sincerely,

Don McEnhill
Russian Riverkeeper

<u>SERVICE LIST</u>

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Alberto Gonzalez, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Tom Howard, Acting Executive Director
State Water Resources Control Board
1001 "I" Street
Sacramento, CA 95814

Jonathan Bishop, Executive Officer
Regional Water Quality Control Board
North Coast Region
5550 Skylane Blvd.,Suite A
Santa Rosa, CA 95403

Roger A. Burch
Agent for Service of Process
Pacific States Industries, Inc. and
North Cloverdale Blvd., LLC
2 West Santa Clara Street, 9th Floor
San Jose, California 95113

**ATTACHMENT A**

Significant Rain Events, Redwood Empire (Cloverdale, CA)
August 16, 2002 – August 16, 2007

| | | | |
|---|---|---|---|
| 11/6/2002 | 4/27/2003 | 2/13/2004 | 2/21/2005 |
| 11/7/2002 | 4/28/2003 | 2/14/2004 | 2/26/2005 |
| 11/8/2002 | 4/29/2003 | 2/15/2004 | 2/27/2005 |
| 11/9/2002 | 4/30/2003 | 2/16/2004 | 3/1/2005 |
| 11/10/2002 | 5/2/2003 | 2/17/2004 | 3/3/2005 |
| 11/12/2002 | 10/31/2003 | 2/18/2004 | 3/4/2005 |
| 12/9/2002 | 11/2/2003 | 2/24/2004 | 3/18/2005 |
| 12/10/2002 | 11/5/2003 | 2/25/2004 | 3/19/2005 |
| 12/12/2002 | 11/6/2003 | 2/26/2004 | 3/20/2005 |
| 12/13/2002 | 11/7/2003 | 3/1/2004 | 3/21/2005 |
| 12/14/2002 | 11/8/2003 | 3/25/2004 | 3/22/2005 |
| 12/15/2002 | 11/9/2003 | 3/26/2004 | 3/23/2005 |
| 12/16/2002 | 11/14/2003 | 3/27/2004 | 3/27/2005 |
| 12/17/2002 | 11/15/2003 | 4/18/2004 | 3/29/2005 |
| 12/19/2002 | 11/29/2003 | 4/19/2004 | 4/3/2005 |
| 12/20/2002 | 11/30/2003 | 4/21/2004 | 4/7/2005 |
| 12/21/2002 | 12/1/2003 | 10/17/2004 | 4/8/2005 |
| 12/25/2002 | 12/2/2003 | 10/20/2004 | 4/22/2005 |
| 12/26/2002 | 12/4/2003 | 10/23/2004 | 4/23/2005 |
| 12/27/2002 | 12/5/2003 | 10/25/2004 | 4/27/2005 |
| 12/28/2002 | 12/6/2003 | 10/26/2004 | 5/4/2005 |
| 12/29/2002 | 12/9/2003 | 11/4/2004 | 5/5/2005 |
| 12/30/2002 | 12/10/2003 | 11/9/2004 | 5/6/2005 |
| 12/31/2002 | 12/12/2003 | 11/10/2004 | 5/8/2005 |
| 1/5/2003 | 12/13/2003 | 11/11/2004 | 5/9/2005 |
| 1/9/2003 | 12/14/2003 | 11/27/2004 | 10/26/2005 |
| 2/12/2003 | 12/19/2003 | 12/6/2004 | 10/27/2005 |
| 2/13/2003 | 12/20/2003 | 12/7/2004 | 10/28/2005 |
| 2/15/2003 | 12/23/2003 | 12/8/2004 | 11/3/2005 |
| 2/16/2003 | 12/24/2003 | 12/26/2004 | 11/7/2005 |
| 2/19/2003 | 12/28/2003 | 12/27/2004 | 11/8/2005 |
| 3/13/2003 | 12/29/2003 | 12/28/2004 | 11/25/2005 |
| 3/14/2003 | 12/31/2003 | 12/29/2004 | 11/28/2005 |
| 3/15/2003 | 1/1/2004 | 12/30/2004 | 11/30/2005 |
| 3/16/2003 | 1/2/2004 | 12/31/2004 | 12/1/2005 |
| 3/19/2003 | 1/6/2004 | 1/1/2005 | 12/17/2005 |
| 3/22/2003 | 1/7/2004 | 1/2/2005 | 12/18/2005 |
| 3/26/2003 | 1/8/2004 | 1/5/2005 | 12/19/2005 |
| 4/3/2003 | 1/9/2004 | 1/11/2005 | 12/20/2005 |
| 4/4/2003 | 1/14/2004 | 1/25/2005 | 12/21/2005 |
| 4/12/2003 | 1/23/2004 | 1/26/2005 | 12/22/2005 |
| 4/13/2003 | 1/24/2004 | 1/27/2005 | 12/25/2005 |
| 4/14/2003 | 1/26/2004 | 1/28/2005 | 12/26/2005 |
| 4/15/2003 | 1/27/2004 | 2/13/2005 | 12/27/2005 |
| 4/16/2003 | 2/1/2004 | 2/17/2005 | 12/28/2005 |
| 4/23/2003 | 2/2/2004 | 2/18/2005 | 12/29/2005 |
| 4/24/2003 | 2/3/2004 | 2/19/2005 | 12/30/2005 |
| 4/25/2003 | 2/6/2004 | 2/20/2005 | 12/31/2005 |

**ATTACHMENT A**

Significant Rain Events, Redwood Empire (Cloverdale, CA)
August 16, 2002 – August 16, 2007

| | | | |
|---|---|---|---|
| 1/1/2006 | 3/6/2006 | 4/4/2006 | 12/10/2006 |
| 1/3/2006 | 3/7/2006 | 4/7/2006 | 12/11/2006 |
| 1/11/2006 | 3/9/2006 | 4/8/2006 | 12/12/2006 |
| 1/13/2006 | 3/10/2006 | 4/9/2006 | 12/13/2006 |
| 1/14/2006 | 3/12/2006 | 4/10/2006 | 12/14/2006 |
| 1/17/2006 | 3/13/2006 | 4/11/2006 | 12/21/2006 |
| 1/18/2006 | 3/14/2006 | 4/12/2006 | 12/26/2006 |
| 1/20/2006 | 3/16/2006 | 4/15/2006 | 12/27/2006 |
| 1/27/2006 | 3/20/2006 | 4/16/2006 | 1/3/2007 |
| 1/28/2006 | 3/23/2006 | 5/19/2006 | 2/7/2007 |
| 1/30/2006 | 3/24/2006 | 10/5/2006 | 2/8/2007 |
| 2/1/2006 | 3/25/2006 | 11/2/2006 | 2/27/2007 |
| 2/4/2006 | 3/27/2006 | 11/11/2006 | 3/26/2007 |
| 2/26/2006 | 3/28/2006 | 11/12/2006 | 4/11/2007 |
| 2/27/2006 | 3/29/2006 | 11/13/2006 | 4/14/2007 |
| 2/28/2006 | 3/30/2006 | 11/16/2006 | 4/19/2007 |
| 3/1/2006 | 3/31/2006 | 11/22/2006 | 4/21/2007 |
| 3/2/2006 | 4/1/2006 | 11/26/2006 | 5/3/2007 |
| 3/3/2006 | 4/2/2006 | 12/8/2006 | |
| 3/5/2006 | 4/3/2006 | 12/9/2006 | |

## ATTACHMENT B

Specific Examples of Discharges in Violation of General Industrial Storm Water Permit,
Redwood Empire (Cloverdale, CA) August 16, 2002 – August 16, 2007

**Total Suspended Solids**

Redwood Empire's storm water analysis indicates that it discharged storm water with a concentration of TSS in excess of the EPA benchmark on at least twelve occasions within the past five years.  Moreover, visual observations conducted by Redwood Empire within the statutory period characterize the discharged storm water as "muddy" or "dark" and note that the source of the pollutant is likely "soil" or "dirt" from the Facility.  Redwood Empire's SWPPP states that "fugitive sawdust" is an unavoidable byproduct of lumbermill operations.  Riverkeeper is informed and believes that these discharges violate the narrative standards for discharges of TSS set forth in the Basin Plan and the Order.  According to its self-monitoring reports, Redwood Empire discharged storm water containing a concentration of TSS in excess of the EPA benchmark value on at least the dates set forth below:

| Date / Location | Parameter | Result | EPA Benchmark |
|---|---|---|---|
| 3/20/06 (DP #1) | TSS | 730 mg/L | 100 mg/L |
| 3/20/06 (DP #2) | TSS | 140 mg/L | 100 mg/L |
| 2/28/05 (DP #1) | TSS | 230 mg/L | 100 mg/L |
| 2/28/05 (DP #1) | TSS | 190 mg/L | 100 mg/L |
| 12/28/04 (DP #2) | TSS | 130 mg/L | 100 mg/L |
| 12/20/04 (DP #1) | TSS | 280 mg/L | 100 mg/L |
| 12/20/04 (DP #2)) | TSS | 130 mg/L | 100 mg/L |
| 12/23/03 (DP #1) | TSS | 150 mg/L | 100 mg/L |
| 4/16/03 (DP #1) | TSS | 200 mg/L | 100 mg/L |
| 4/16/03 (DP #2) | TSS | 190 mg/L | 100 mg/L |
| 3/7/02 (DP #1) | TSS | 120 mg/L | 100 mg/L |

**Specific Conductivity**

Redwood Empire's storm water analysis indicates that it discharged storm water with a specific conductivity in excess of the proposed benchmark on at least three occasions within the past five years.  According to its self-monitoring reports, Redwood Empire discharged storm water with a level of specific conductivity in excess of the proposed benchmark on at least the dates set forth below:

| Date / Location | Parameter | Result | Proposed Benchmark |
|---|---|---|---|
| 12/23/03 (DP #2) | Spec. Cond. | 220 μmho/cm | 200 μmho/cm |
| 12/23/03 (DP #1) | Spec. Cond. | 210 μmho/cm | 200 μmho/cm |
| 3/7/02 (DP #1) | Spec. Cond. | 210 μmho/cm | 200 μmho/cm |

ATTACHMENT B

Specific Examples of Discharges in Violation of General Industrial Storm Water Permit,
Redwood Empire (Cloverdale, CA) August 16, 2002 – August 16, 2007

**Total Organic Carbon**

      Redwood Empire's storm water analysis indicates that the Facility continues to discharge storm water containing TOC in excess of the proposed benchmark of 110 mg/L. On at least four occasions during the statutory period, Redwood Empire either failed to analyze its storm water for TOC or failed to report the analysis to the Regional Board. Redwood Empire's SWPPP states that hydrocarbons are a potential pollutant all over the Facility. According to its own self-monitoring reports, Redwood Empire discharged storm water containing a concentration of TOC in excess of the proposed benchmark on at least the dates set forth below:

| Date / Location | Parameter | Result | Proposed Benchmark |
|---|---|---|---|
| 3/20/06 (DP #1) | TOC | 860 mg/L | 110 mg/L |
| 3/20/06 (DP #2) | TOC | 280 mg/L | 110 mg/L |
| 2/28/05 (DP #1) | TOC | 420 mg/L | 110 mg/L |
| 2/28/05 (DP #1) | TOC | 230 mg/L | 110 mg/L |
| 12/28/04 (DP #2) | TOC | 160 mg/L | 110 mg/L |
| 12/20/04 (DP #1) | TOC | No data | 110 mg/L |
| 12/20/04 (DP #2) | TOC | No data | 110 mg/L |
| 12/23/03 (DP #1) | TOC | 210 mg/L | 110 mg/L |
| 12/23/03 (DP #2) | TOC | 190 mg/L | 110 mg/L |
| 4/16/03 (DP #1) | TOC | No test | 110 mg/L |
| 4/16/03 (DP #2) | TOC | No test | 110 mg/L |

**Zinc**

      Redwood Empire's testing data indicates that it discharged zinc in excess of the EPA benchmark value on at least two occasions and in excess of the Basin Plan objective on at least three occasions within the last five years. Also, despite having found significant concentrations of zinc in its storm water discharge, Redwood Empire failed to test for zinc on at least four occasions within the statutory period. Redwood Empire's SWPPP states that zinc is a potential pollutant from lumbermill operations. According to its self-monitoring reports, Redwood Empire discharged storm water containing a concentration of zinc in excess of the EPA benchmark value and/or the Basin Plan objective on at least the dates set forth below:

| Date / Location | Parameter | Result | Basin Plan Objective | EPA Benchmark |
|---|---|---|---|---|
| 3/20/06 (DP #1) | Zinc | 0.27 mg/L | 0.1 mg/L | 0.117 mg/L |
| 3/20/06 (DP #2) | Zinc | 0.11 mg/L | 0.1 mg/L | 0.117 mg/L |
| 2/28/05 (DP #1) | Zinc | 0.91 mg/L | 0.1 mg/L | 0.117 mg/L |
| 12/20/04 (DP #1) | Zinc | No Test | 0.1 mg/L | 0.117 mg/L |
| 12/20/04 (DP #2) | Zinc | No Test | 0.1 mg/L | 0.117 mg/L |
| 4/16/03 (DP #1) | Zinc | No Test | 0.1 mg/L | 0.117 mg/L |
| 4/16/03 (DP #2) | Zinc | No Test | 0.1 mg/L | 0.117 mg/L |

**ATTACHMENT B**

Specific Examples of Discharges in Violation of General Industrial Storm Water Permit,
Redwood Empire (Cloverdale, CA) August 16, 2002 – August 16, 2007

**Chemical Oxygen Demand**

Despite detecting high COD on two occasions in 2001, Redwood Empire subsequently failed to analyze its storm water for the parameter, in violation of Section B(5) of the General Permit. This constitutes at least one violation for each day within the past five years during which Redwood Empire failed to sample its storm water for COD.. Redwood Empire's SWPPP states that fugitive sawdust and woodchips may increase COD in receiving waters. According to its self-monitoring reports, Redwood Empire either discharged storm water containing a concentration of COD in excess of the proposed benchmark, or failed to analyze for COD, on at least the dates set forth below:

| Date / Location | Parameter | Result | EPA Benchmark |
|---|---|---|---|
| 4/16/03 (DP #1) | COD | No test | 120 mg/L |
| 4/16/03 (DP #2) | COD | No test | 120 mg/L |
| 3/7/02 (DP #1) | COD | No test | 120 mg/L |
| 3/7/02 (DP #1) | COD | No test | 120 mg/L |
| 12/6/01 (DP #1) | COD | 300 mg/L | 120 mg/L |
| 12/6/01 (DP #2) | COD | 180 mg/L | 120 mg/L |